[Civ. No. 12898. First Dist., Div. Two. Jan. 9, 1946.]

CITY OF SALINAS, Appellant, v. PACIFIC TELEPHONE AND TELEGRAPH COMPANY (a Corporation), Respondent.

Russell Scott, City Attorney, for Appellant.

Pillsbury, Madison & Sutro and Hudson, Martin & Ferrante for Respondent.

GOODELL, J.—This appeal was taken from a judgment of dismissal entered after the sustaining of a demurrer to the complaint without leave to amend.

The complaint alleges that on May 2, 1891, the city granted a twenty-five year franchise to the predecessor of the respondent; that on November 6, 1916, that franchise was renewed for another twenty-five years, and the latter term expired on December 6, 1941. It also alleges that since that expiration the respondent has not procured from the city any further franchise and now operates and maintains its telephone system and facilities in Salinas without any franchise.

On August 9, 1943, it is alleged, the city adopted the ordinance upon which this action is based. This ordinance directs the respondent to remove all its property within one year, or, in the alternative, to pay the city the reasonable rental value of the temporary use of the streets, alleys and other public places, fixed and declared therein to be $30 a day, plus the furnishing to the city for its use of twenty business telephones and certain fire and police alarm services. The ordinance provides that if and when the respondent obtains a franchise the ordinance will become null and void. The complaint alleges the reasonable value of the use of the twenty telephones to be $75 a month. It states that there is due, owing, and unpaid on account of the reasonable rental value of the occupation and use of the streets, alleys and public places since December 6, 1941, $25,065, with interest at 1 per cent per month as provided in the ordinance. The prayer is for $25,065 with interest and costs.

The respondent interposed a general demurrer, accompanying which it disclosed its position, namely, that by virtue of section 536, Civil Code, it enjoys in Salinas and has enjoyed ever since May 20, 1905, a franchise granted by the state itself.

A stipulation was entered into that ''Upon the hearing of the defendant's demurrer filed herein, one question will be argued and submitted to the court for determination, namely,

'Did the Charter of Salinas as it existed on May 20, 1905, confer upon the City the power to grant franchises to telephone companies to construct and maintain their poles, wires and conduits, etc., in the streets of the City?'' The significance of the date is that on May 20, 1905, said section 536, as reenacted, went into effect.

The trial court answered this question in the negative. In a written decision it held that the doctrine of strict construction is adhered to in this state and that under this doctrine the wording of the 1903 charter did not confer the power to grant franchises to telephone companies.

The respondent concedes that section 536, Civil Code, as reenacted in 1905 does not apply to such chartered cities as prior to the reenactment were empowered by their charters to grant telephone franchises (*Sunset Tel. & Tel. Co.* v. *Pasadena,* 161 Cal. 265 [118 P. 796]). The appellant concedes, on the other hand, that if the charter of a city does not empower the municipality to grant telephone franchises then section 536 does apply. (*Western Union Tel. Co.* v. *Hopkins,* 160 Cal. 106 [116 P. 557].)

Section 536, Civil Code, ever since its reenactment in 1905 has read: ''Telegraph or telephone corporations may construct lines of telegraph, or telephone lines along and upon any public road or highway, along or across any of the waters or lands within this state, and may erect poles, posts, piers, or abutments for supporting the insulators, wires, and other necessary fixtures of their lines, in such manner and at such points as not to incommode the public use of the road or highway or interrupt the navigation of the waters.''

The purpose of the 1905 change was to add *telephone lines* and *telephone corporations* to the section. Theretofore it had covered only telegraph lines and telegraph corporations. The section has been construed as a continuing offer by the state to all telegraph and telephone companies to use without compensation such public highways as may be convenient or necessary for the operation of their lines (*Postal-Telegraph-Cable Co.* v. *Los Angeles,* 164 Cal. 156 [128 P. 19]), and the term ''public highways'' includes the streets of cities (*Western Union Tel. Co.* v. *Hopkins,* 160 Cal. 106, 118 [116 P. 557]).

Appellant contends that by the express terms of its 1903 charter it had the power to grant franchises for telephone purposes, and hence before 1905 the state had already conferred upon the city such power and had thereby deprived

itself thereof. The respondent argues, to the contrary, that the charter did not confer upon the city the power to grant telephone franchises and therefore the company, by its acceptance in 1905 of the right granted by section 536, acquired a complete franchise for its telephone lines from the state without any liability to compensate the city. In 1903, while the original 1891 franchise was in effect, a new charter was adopted by the city and approved by the Legislature. (Stats. 1903, p. 599.) It contained the following provision:

". . . Subject to the provisions, limitations and restrictions in this charter contained, the council shall have power: . . .

"48. To grant the right to construct and maintain and to regulate the construction and maintenance of all pipes, tubes, conduits, wires and other electric, telegraph and mechanical apparatus in, along, over, under and across all public streets, and highways, within the city; to require all telegraph, telephone and electric light wires to be placed underground; and to regulate the mode of wiring houses, buildings and structures for telegraph, telephone, electric light, electric power and all other electric service."

The question presented to the trial court and on this appeal involves the interpretation of the foregoing provision.

It will be noted that the first clause does not include the word "telephone" but that the second and third clauses do so.

■ It is settled law that "a delegation of power to grant franchises is strictly construed in favor of the public, and the agency to which the power is delegated has such powers, and only such powers, as are expressed or necessarily implied." (37 C.J.S. 160.) California has followed this rule of strict construction since its early days (*Douglass* v. *Mayor of Placerville*, 18 Cal. 643, 647). In *Wichmann* v. *City of Placerville*, 147 Cal. 162, 164 [81 P. 537] the Supreme Court stated that the doctrine of strict construction was "a proposition too well settled to call for discussion." ■ The established rule for the measurement of the powers of a municipal corporation is stated in 1 Dillon on Municipal Corporations, fifth edition, section 237, as follows: "It is a general and undisputed proposition of law that a municipal corporation possesses and can exercise the following powers, and no others: First, those granted in express words; second, those necessarily or fairly implied in or incident to the powers expressly granted; third, those essential to the accomplishment of the declared objects and purposes of the corporation,—not simply convenient, but

indispensable. Any fair, reasonable, substantial doubt con-
cerning the existence of power is resolved by the courts against
the corporation, and the power is denied.'' That rule has
been approved in a long line of decisions in this state. (*Von
Schmidt* v. *Widber,* 105 Cal. 151, 157 [38 P. 682] ; *Hyatt* v.
*Williams,* 148 Cal. 585 [84 P. 41] ; *Oro Electric Corp.* v. *Rail-
road Commission,* 169 Cal. 466, 477 [147 P. 118] ; *City of
Long Beach* v. *Lisenby,* 175 Cal. 575, 576 [166 P. 333] ; *City
of Madera* v. *Black,* 181 Cal. 306, 312 [184 P. 397] ; *Miller* v.
*City of Los Angeles,* 185 Cal. 440, 444 [197 P. 342].)

The ''Powers of the Council'' are contained in sec-
tion 19 of article II. Subsection 48 thereof is divided into
three clauses, the first of which reads: ''To gran*t* the right to
construct and maintain and to regulate the construction and
maintenance of all pipes, tubes, conduits, wires and other elec-
tric, telegraph and mechanical apparatus in . . . all public
streets, and highways, within the city; . . .''

We are satisfied that, bearing the rule of strict construction
in mind, this language was sufficient to grant a telephone
franchise despite the fact that the word ''telephone'' is not
to be found therein.

It must be conceded that if the clause had ended with the
word ''wires'' it would have to be held to include all pipes,
tubes, conduits and wires of a telephone system. The first
inquiry, then, is whether the added language so restricts or
qualifies that which preceded it as to destroy its inclusive
character. The words ''and other electric . . . apparatus''
do not do so, for it is common knowledge that pipes, tubes
and conduits are in general use to enclose and carry tele-
phone wires as well as other wires used to conduct electric
current, whether they be telegraph wires or those conducting
electricity for light, heat and power. It is common knowledge
also that a telephone or telegraph system necessarily contains,
in addition to pipes, tubes, conduits and wires, countless other
pieces of electrical equipment and apparatus. ''Apparatus''
is a word of broad meaning, defined in Webster's New Inter-
national Dictionary, second edition, as ''A collection or set
of materials, implements, or utensils, for a given work, experi-
mental or operative.'' ''Equipment,'' ''instrument'' and
''machine'' are there given as synonyms. The respondent in
support of its argument that ''Commonly . . . 'electric' utili-
ties are understood to be those selling electricity for light,
heat and power, as distinguished from the telephone busi-

ness . . ." cites *Southwestern Bell Telephone Co.* v. *Drainage Dist. No. 5*, 215 Mo.App. 456 [247 S.W. 494], which holds that the term "electric wires" does not include "telephone wires." There a judgment for the plaintiff Telephone Company was affirmed. In that case the drainage district, in moving one of its dredges across a road along which the plaintiff's telephone wires were strung, cut the wires. The defendant district assumed to act under a statute which applied to "houses, buildings and other structures" and the court held a dredge not to be within this language. Another reason why the judgment was upheld was that the act described *electric wires, transmission wires and trolley wires.* A journal of the Legislature was produced showing that "telephone wires, cable, etc., was stricken from the bill as originally introduced, and [that the bill had] passed after such portion as referred to telephone and telegraph companies was stricken out." "Probably" said the court, "the purpose of the bill was to provide for removal of wires carrying deadly electricity, and which, of course, did not apply to telephone wires." This case, therefore, is not in point. The respondent cites it as "the only case on the subject," but in our own state *In re Johnson*, 167 Cal. 142 [138 P. 740] (1914) deals with the same subject. Section 591, Penal Code, as it then read made it a misdemeanor to interfere with "any line of telegraph or telephone, *or any other line used to conduct electricity.*" (Emphasis ours.) Section 593 made it a felony to interfere with any line "transmitting electricity for light, heat, or power." One Cannon had been convicted of a felony under section 593 and sought, by habeas corpus, a holding that the words of 591 "or any other line used to conduct electricity" repealed section 593. The court said that "It is true that the words 'or any other line used to conduct electricity' might be interpreted in certain juxtapositions as referring to electric light and power lines. Used as they are in section 591, following the enumeration of telephone and telegraph lines, they doubtless come within that rule of construction known as *ejusdem generis* and refer to things of the same general nature as those specified." From this it is clear that the word "electric" does not necessarily or exclusively connote light, heat and power.

The word "mechanical" neither adds nor detracts anything for it simply means that there may be *mechanical* apparatus in addition to *electrical* apparatus (strictly speak-

ing) and under the *ejusdem generis* rule it must be held to mean such mechanical apparatus as is similar to, or of the same general character as, the things theretofore mentioned in the clause.

This leaves only the word "telegraph" for discussion. It is true, as the respondent argues, that " 'telegraph' and 'telephone' are both words in common use, commonly understood to mean two very different things." Moreover, we would add that the Pasadena case, *supra*, definitely holds that the word "telegraph" as used in section 536, Civil Code, before its reenactment did not include "telephone." But that case was decided in 1911, and it was not until then that it was definitely settled in this state that "telegraph" had *not* included "telephone." As part of its argument the respondent says that "the United States Supreme Court had decided, just before Salinas framed its charter, that the word 'telegraph' in the Post Roads Act did not include 'telephone' " citing *Richmond* v. *Southern Bell Tel. & Tel. Co.* (1899), 174 U.S. 761 [19 S.Ct. 778, 43 L.Ed. 1162]. The respondent's predecessor was not convinced by this case for, in the Pasadena case, decided twelve years later, it contended that "telegraph" *had* included "telephone" as used in section 536, Civil Code, before its reenactment in 1905. The Richmond case is cited by the respondent under the argument that everybody should have known after its decision was handed down in May, 1899, that "telegraph" did not include "telephone." However, seven months later in December, 1899, in the case of *Davis* v. *Pacific Tel. & Tel. Co.*, 127 Cal. 312 [57 P. 764, 59 P. 698], the Supreme Court of this state held that, as used in section 591, Penal Code (discussed earlier herein), "telephone" *was* included in the meaning of "telegraph" saying—"that a substantial identity exists between the two words."

In the Pasadena case (161 Cal. at 278) in construing section 536, Civil Code, the court uses this language "It is to be remembered that the question in determining the meaning of the word 'telegraph' contained in this statutory grant is, what was in the minds of the legislators as to its meaning *when they used it.*" (Emphasis added.) The same thought is expressed in the following quotation from the Richmond case on the same page (278) "But the question is, not what Congress might have done in 1866, nor what it may or ought

now to do, but what was in its mind *when enacting the statute in question."* (Emphasis added.)

It was all very well for the Supreme Court in 1911 to settle, once for all, the mooted question whether "telegraph" included "telephone," but the present inquiry is, as just emphasized, what was in the legislative mind *when the Salinas charter was drafted in 1903?* The Pasadena case, it is true, distinguished the Davis case, but in the interval between the decision in the Davis case and the decision in the Pasadena case—about twelve years—the pronouncement of our Supreme Court "that a substantial identity exists between the two words" was the last word in this state on the subject, binding on the courts, guiding the legal profession and guiding the Legislature. It was during this interval, in 1903, that the Salinas charter was drafted and adopted, and there is every reason to assume that to its draftsmen there was, as our Supreme Court four years earlier had held, "a substantial identity . . . between the two words" *telephone* and *telegraph.* For these reasons the presence of the word "telegraph" in the clause is understandable, and presents no problem at all under the rule *"inclusio unius est exclusio alterius,"* or otherwise.

We have discussed the first clause of subsection 48 independently of the remaining two clauses and are satisfied that, standing alone, it authorizes the granting of a telephone franchise. The respondent argues that it does not do so for the reason, among others, that the other two clauses mention both telephone and telegraph wires, and other wires as well, and that such inclusion of those words is significant.

The second and third clauses of section 48 grant the power "to require all telegraph, telephone and electric light wires to be placed underground; and to regulate the mode of wiring houses, buildings and structures for telegraph, telephone, electric light, electric power and all other electric service." The first clause opens with the words *"To grant the right."* The second opens with the words *"to require"* and the third with the words *"and to regulate."* Conceding that it might be argued that the second and third clauses do not purport to *grant,* we do not think they destroy the meaning of the first clause, particularly in view of what has just been said with respect to the inclusiveness of the word "telegraph" as contemplated by the draftsmen of the legislation at that time or, to put it another way, considering the fact that at

that time the two words, on high authority, were undoubtedly treated as synonymous. Why the word "telephone" was omitted from the first clause, but included in the second and third clauses is difficult to understand, but we cannot for a moment believe that such omission can give to the word "telegraph," found therein, a restrictive effect in view of what has just been said.

The case of *Oro Electric Corp.* v. *Railroad Commission,* 169 Cal. 466 [147 P. 118], is relied on by the respondent but it is distinguishable from the case at bar. In that case the court had to decide whether, before the Public Utilities Act was adopted, the city of Stockton had been empowered by its charter to grant franchises for the furnishing of electric light and power to the city's inhabitants. The charter in general terms gave the city the control of the streets as well as the lighting thereof and allowed it to make rules of a local, police and sanitary nature. Specifically the council was empowered "To grant franchises permitting any company or corporation to lay and maintain tracks, and to pass, with steam railroads . . . along, upon and across . . . any streets of the city . . ." and "To grant franchises for the construction of street railroads on and along the streets of the city." The charter went no further in enumerating the utilities for which a franchise could be granted, and the court held that in the absence of such enumeration, and in the face of the express specification of said named utilities, general powers found elsewhere in the charter such as the broad grant of power to control and regulate the streets (169 Cal. p. 478) were insufficient to authorize a franchise for electric light and power. In the Oro case the controversy did not arise, as it did here, over the meaning of a clause purporting to grant certain powers, but the decision turned on the clear-cut proposition that the granting clause of the Stockton charter embraced, in express terms, *steam railroads and street railroads,* and conspicuously failed to embrace, even by implication, *electric light and power.*

But it must be noted that the decisions herein discussed were written before the 1914 amendment to section 6 of article XI of the Constitution; that, prior to the amendment the *power* of the state was supreme over municipalities "except in municipal affairs"; that, by the 1914 amendment the *power* of the cities was supreme in all municipal affairs unless that power was limited or restricted by express provisions "in their several charters."

The provisions of subdivision 48 of the charter heretofore cited were broad enough to enable the city to grant franchises for the use of the city streets for gas, oil, water and steam pipes, and police, fire, or private intercommunicating wires and apparatus though these various facilities were not mentioned specially in the section. All these facilities may run "along, over, under and across all public streets" and it is the right to use these streets which is the basis of the municipal franchise. It is apparent that if section 536 of the Civil Code had never been enacted the courts would have no difficulty in holding that the city had *power* to grant the franchise under the charter section.

The record in this case presents an unusual situation. It appears from the stipulation already quoted that there was but one legal question presented to the trial court on the submission of the demurrer, namely, whether, under the 1903 charter, the city could and did grant a telephone franchise. All other questions were reserved. In the record filed herein the demurrer is not set out in full. The second and third grounds are withheld from this court by the words "(Omitted pursuant to stipulation)." Whether said grounds II and III had to do with the validity of ordinance No. 380, upon which this suit was based, we have no means of determining. The only ground appearing on the face of the demurrer *as shown by the record on appeal* is that "The complaint does not state facts sufficient to constitute a cause of action." In these circumstances this court cannot intelligently discuss or pass upon any point other than that presented to the trial court. On that point we are satisfied, as already indicated, that the charter gave the power to the city to grant a telephone franchise, and that, therefore, the court erred in ruling as it did.

For these reasons the judgment of dismissal is reversed and the cause remanded for further proceedings in accordance with the stipulation on file, and such other proceedings as may be proper.

Nourse, P. J., concurred.

A petition for a rehearing was denied February 8, 1946, and respondent's petition for a hearing by the Supreme Court was denied February 25, 1946.